SLIP OPINION

Cite as 2015 Ark. 341

# SUPREME COURT OF ARKANSAS

No. CR-14-1019

| | |
|---|---|
| ANDREW M. HOLLAND<br><br>APPELLANT | **Opinion Delivered** October 1, 2015 |
| V. | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60-CR-11-1159] |
| STATE OF ARKANSAS<br><br>APPELLEE | HONORABLE BARRY SIMS, JUDGE<br><br>AFFIRMED. |

**COURTNEY HUDSON GOODSON, Associate Justice**

A jury in the Pulaski County Circuit Court found appellant Andrew M. Holland guilty of sexual assault in the first degree and sexual assault in the second degree. Respectively, he received concurrent terms of forty and thirty years in prison. For reversal, Holland contends that the circuit court erred by (1) permitting the introduction of evidence under the "pedophile exception"; (2) by not allowing evidence of the victims' motives to falsely accuse him of the crimes; and (3) by denying him access to one of the victim's psychological records. We affirm on all issues.

*Factual Background*

By an amended felony information, the prosecuting attorney in Pulaski County charged Holland with one count of first-degree sexual assault as perpetrated against a minor, XB, and with a single count of second-degree sexual assault as committed against another minor, JD. The evidence adduced at trial reflects that both boys were being raised in single-

parent homes by their mothers. In the case of XB, Holland was a long-time family acquaintance, and XB's mother enlisted Holland's assistance in providing discipline to XB after he began to experience behavioral problems. With respect to JD, he developed an interest in rap music when he was in the eighth grade. Holland had a recording studio in his home and had cultivated the musical careers of other young rap artists. JD solicited Holland's services as a manager, and Holland agreed to do so after speaking with JD's mother. Under Holland's tutelage, JD performed shows in Little Rock and Conway. Holland also chaperoned JD and another boy on a trip to New York to audition for a television show.

XB, who was twenty years old at the time of trial, testified that, between the ages of thirteen and fifteen and at a time when he was getting into trouble at school, he was at Holland's house one day watching television when Holland asked him to come into his bedroom. XB said that Holland directed him to sit on Holland's knee and that Holland began rubbing XB's leg. XB recalled that Holland next placed a pornographic movie into the DVD player and told XB to remove his clothes and get into the bed. Holland also undressed and lay behind XB under the covers. XB testified that Holland fondled XB's penis, and XB stated that he felt the head of Holland's penis inside his "butt." XB said that, while this was occurring, a lot of thoughts were going through his mind and that he did not understand what was happening. XB stated that Holland commented on the large size of XB's penis. XB further testified that he returned to the living room and that Holland gave him a bottle of lotion to use to "finish up." A few years later, XB was adjudicated as a delinquent juvenile for committing the offenses of commercial burglary and theft of property. He disclosed the

abuse to the leader of a group home in February 2010.

In his testimony, JD related that he was fifteen years old when he met Holland in July 2010. He said that Holland began randomly touching him and rubbing his thighs almost immediately after he had begun to visit Holland's home. JD testified that the touching escalated shortly thereafter when Holland asked him to sit on his bed. He stated that Holland kissed him on his cheek and neck and that Holland put his hand inside JD's underwear and felt his penis for approximately fifteen minutes. JD testified that Holland stated, "My little homey has a big dick," when he reached inside JD's underwear. JD testified that similar behavior occurred on a number of occasions. He also said that Holland would sometimes place JD's hand on Holland's penis, both outside and under Holland's clothes, and that Holland had shown him pornographic images of penises on his laptop.

JD further testified that he learned of another accusation against Holland from reading a newspaper article in March 2011 and that Holland stopped managing him during that time frame. He also acknowledged that he was placed in Rivendell after an altercation with his mother in October 2011. JD testified that he disclosed the abuse when answering questions during the intake process at Rivendell in November 2011 when he was moved into long-term care at that facility.

In addition to the victims, the State offered the testimony of MJ; the testimony of two men from California, JG and JP; and a 1989 probation order from California reflecting Holland's conviction on two counts of "Lewd/Lascivious Acts with Child under 14 Years." The victims in that case were JG and another boy, RR. MJ, a twenty-eight-year-old man

from North Little Rock, testified that when he was young, he and other boys spent time at Holland's house. He said that Holland paid him for helping with yard work. MJ testified that in November 1999, when he was fourteen years old, he was walking home one night past Holland's house and that Holland invited him inside. According to MJ, Holland turned on a pornographic movie, which caused MJ to have an erection. MJ said that Holland performed oral sex on him and commented on the size of MJ's penis. MJ stated that they went into the bedroom and that Holland put lotion between his own legs and instructed MJ to lie on top of him and to "hump" him, while Holland lay on his stomach. Afterwards, they changed positions. MJ testified that Holland gave him money and told him not to tell anyone. MJ further testified that he told his uncle what had happened and that he also spoke with the police.

JG testified that he met Holland in California in 1988 when he was thirteen years old and being raised by his mother. He was playing basketball one day when Holland approached him and offered to buy him a new pair of shoes, as JG's shoes had holes in them. JG said that Holland gave him a ride home and that Holland told his mother that he would take JG under his wing. One night after skating, JG spent the night with Holland. JG said that he was asleep in bed and awoke to find Holland rubbing Icy Hot on his legs. JG testified that Holland put lotion on his hands and started rubbing JG's penis. When JG ejaculated, Holland instructed JG to hold his own penis in his hand and say, "You're Andy's little king." JG described another incident when Holland took him to an empty apartment where Holland tried to fondle JG using "Motion Lotion" as a lubricant. JG testified that he made Holland

stop and that Holland became angry and threw money at him.

In his testimony, JP testified that he and Holland lived in the same apartment complex and that Holland was one of the adults who played football with him and his friends. JP stated that Holland also helped his grandmother, with whom JP lived, and that Holland assumed the role of a father figure to him with his grandmother's blessing. He said that, in 1988, Holland asked him to come over to play Nintendo. JP testified that Holland put on a pornographic movie and asked JP if he could make his penis hard. JP said that Holland began rubbing JP's penis on top of his clothes and then asked him to unbuckle his pants and go into the bedroom. JP saw that there were many types of lotions in Holland's bedroom, and he said that Holland masturbated him and made him masturbate Holland. JP said that this was the first of many similar episodes. He further testified about an occasion where Holland masturbated and performed oral sex on both him and another boy named RR and also required them both to masturbate him. This incident took place at a boys' group home where Holland worked.

Based on this and other testimony, the jury found Holland guilty as charged and sentenced him as previously stated in this opinion. Holland appealed, and the court of appeals affirmed his convictions and sentences. *Holland v. State*, 2014 Ark. App. 644, 448 S.W.3d 220. This court granted Holland's petition for review. When we grant a petition for review, we treat the appeal as if it had been filed originally in this court. *Schneider v. State*, 2015 Ark. 152, 459 S.W.3d 296.

*Pedophile Exception*

Holland argues on appeal that the circuit court erred by permitting evidence of prior misconduct under the pedophile exception to Rule 404(b) of the Arkansas Rules of Evidence. Under this point, Holland first challenges the testimony of MJ. He argues that evidence admitted under Rule 404(b) is subject to the balancing test imposed by Rule 403, and he maintains that MJ's testimony was unfairly prejudicial because MJ's allegation was brought to the attention of law enforcement officials in 1999; because the allegations were investigated and not brought to prosecution; because the statute of limitations has since expired; and because he is not able to defend himself due to the passage of time. Holland also contends that the testimony was unfairly prejudicial because MJ's testimony was unreliable, as it was shown on cross-examination that his testimony at trial materially differed from the statements that MJ made to the police at the time of the occurrence.

Also within this point, Holland claims error in the admission of the testimony of JG and JP, as well as Holland's previous convictions in California. He contends that the evidence was too remote in time and not sufficiently similar to the acts for which he was on trial.

Rule 404(b) provides that

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Evidence is not admissible under Rule 404(b) simply to show a prior bad act. *Vance v. State*, 2011 Ark. 243, 383 S.W.3d 325. In reviewing the admission of evidence under Rule 404(b),

this court has observed that a circuit court has broad discretion in deciding evidentiary issues, and its decisions are not reversed absent an abuse of discretion. *Rounsaville v. State*, 2009 Ark. 479, 346 S.W.3d 289. The abuse-of-discretion standard is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Chatmon v. State*, 2015 Ark. 28.

When the charge concerns the sexual abuse of a child, evidence of other crimes, wrongs, or acts, such as sexual abuse of that child or other children, is admissible under the "pedophile exception" to show motive, intent, or plan pursuant to Ark. R. Evid. 404(b). *Fields v. State*, 2012 Ark. 353. We have approved allowing evidence of the defendant's similar acts with the same or other children when it is helpful in showing a proclivity for a specific act with a person or class of persons with whom the defendant has an intimate relationship. *Kelley v. State*, 2009 Ark. 389, 327 S.W.3d 373. The rationale for this exception is that such evidence helps to prove the depraved sexual instinct of the accused. *Jeffries v. State*, 2014 Ark. 239, 434 S.W.3d 889. Further, such proof is admissible to show the familiarity of the parties, disposition, and antecedent conduct toward one another and to corroborate the testimony of the victim. *Fields*, *supra* (citing *Free v. State*, 293 Ark. 65, 732 S.W.2d 452 (1987)). For the pedophile exception to apply, we require that there be a sufficient degree of similarity between the evidence to be introduced and the sexual conduct of the defendant. *Eubanks v. State*, 2009 Ark. 170, 303 S.W.3d 450. We also require that there be an "intimate relationship" between the perpetrator and the victim. *Chunestudy v. State*, 2012 Ark. 222, 408 S.W.3d 55.

SLIP OPINION

Evidence admitted pursuant to Rule 404(b) must not be too separated in time, making the evidence unduly remote. *Brown v. State*, 2012 Ark. 399, 424 S.W.3d 288. The circuit court is given sound discretion over the matter of remoteness and will be overturned only when it is clear that the questioned evidence has no connection with any issue in the present case. *Nelson v. State*, 365 Ark. 314, 229 S.W.3d 35 (2006).

Evidence to be admitted under the pedophile exception is also subject to exclusion under Rule 403, which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See Hernandez v. State*, 331 Ark. 301, 962 S.W.2d 756 (1998). We review a circuit court's decision to admit evidence over a Rule 403 objection under an abuse–of–discretion standard as well. *Flanery v. State*, 362 Ark. 311, 208 S.W.3d 187 (2005).

We hold that the circuit court did not abuse its discretion in ruling that MJ's testimony was not unfairly prejudicial even though no charges had been filed and because of the passage of time. Rule 404(b) makes no distinction between substantiated and unsubstantiated conduct, or between charged and uncharged conduct. *Allen v. State*, 374 Ark. 309, 287 S.W.3d 579 (2008). This court has explicitly held that our application of the pedophile exception does not require that the prior act be charged or substantiated. *Bell v. State*, 371 Ark. 375, 266 S.W.3d 696 (2007). Furthermore, seven years had elapsed between the incident involving MJ in 1999 and the acts concerning XB in 2006, and there was an eleven–year difference in the case of JD. In *Nelson*, *supra*, we held that, even though the defendant's prior conviction was fourteen years old, the evidence tended to show his intent to commit

the charged crime and was therefore not too remote in time to be relevant. In so holding, we observed that a reasonableness standard is used to determine whether a crime remains relevant rather than a specific time limit. Accordingly, when considering remoteness in the context of the pedophile exception in *Lamb v. State*, 372 Ark. 277, 275 S.W.3d 144 (2008), we concluded that the charged acts and the acts the defendant committed some twenty years earlier against his daughters were sufficiently similar to show his tendency for deviate sexual impulses toward young girls such that the prior acts were not too remote in time to be relevant. We conclude that the circuit court did not abuse its discretion.

As for Holland's claim that MJ's testimony was unreliable and thus unfairly prejudicial, we note that Holland's counsel conducted a thorough cross-examination of the witness and exposed the inconsistencies between his testimony and the statements that he made to the police in the past. These inconsistencies went to the weight of the testimony, rather than its admissibility, and the veracity of the witness's testimony was for the jury to assess. *Harris v. State*, 331 Ark. 353, 961 S.W.2d 737 (1998) (observing that the resolution of issues of credibility and conflicting versions of facts rests with the trier of fact).[1]

We also find no abuse of discretion in the admission of the testimony of JG, JP, and Holland's prior convictions. Contrary to Holland's assertion, the similarity between these past

---

[1]We also note that Holland asserts a due-process claim with respect to MJ's testimony. Although Holland raised this contention in his motion in limine to exclude MJ's testimony, he failed to develop that argument or to obtain a ruling on this issue. Consequently, we decline to address this point. This court has stated that the circuit court must have the benefit of the development of the law by the parties in order to rule adequately on the issues, and it is incumbent upon an appellant to obtain a ruling from the circuit court in order to preserve an argument for appeal. *Gooch v. State*, 2015 Ark. 227, 463 S.W.3d 296.

acts of misconduct and the facts of the present case was striking. While the acts may have differed somewhat from victim to victim, the behavior included Holland's touching the boys' penises, requiring the boys to fondle him, forcing oral sex, as well as simulating intercourse. Clearly, these acts were sufficiently similar to pass muster under the pedophile exception. Furthermore, the evidence revealed Holland's penchant for befriending boys in their mid-teens who were being raised in single-parent homes by their mothers or grandmothers without a father figure. Holland sought to fill that gap by gaining the confidence of the boys' caretakers and by fostering a relationship with the young boys to either step into the role of mentor or disciplinarian. These acts occurred in Holland's home or a place under his control. Holland also made similar crude remarks about the young boys' anatomy, utilized pornography, and frequently used lotions to accomplish his purposes. The evidence thus clearly demonstrates that the acts were of a same or similar nature and that he had an intimate relationship with these children. As for the passage of time, applying our standard of reasonableness, the past acts were not too remote in time to be irrelevant. The circuit court did not abuse its discretion by ruling that the evidence was admissible under the pedophile exception. Accordingly, we affirm on this point.

*Rape-Shield Statute*

Holland next argues that the circuit court erred by excluding evidence under the rape-shield statute that he claims has a bearing on XB's and JD's motive to accuse him of the crimes. Holland filed a pretrial motion proposing to offer evidence that XB had an abscess on his penis at the time he disclosed the abuse to the group leader. Holland argued that XB's

condition may have been caused by sexual contact, and he asserted that the diagnosis and the embarrassment it caused motivated XB to falsely accuse Holland of the abuse. Holland also filed a pretrial motion to present testimony that JD engaged in homosexual contact with other persons and that, when faced with family criticism, JD had acted in a sexually active manner to disprove allegations that he was a homosexual. Based on this assertion, Holland contended that JD accused him of impropriety in an effort to prove that he was not gay.

The rape-shield statute provides that evidence of specific instances of the victim's prior sexual conduct with any person is not admissible by the defendant, either through direct examination of any witness or through cross-examination of the victim or other prosecution witness, to attack the credibility of the victim or for any other purpose. Ark. Code Ann. § 16-42-101(b) (Repl. 1999). An exception is granted where the circuit court, at an in camera hearing, makes a written determination that such evidence is relevant to a fact in issue and that its probative value outweighs its inflammatory or prejudicial nature. *Stewart v. State*, 2012 Ark. 349, 423 S.W.3d 69. The statute's purpose is to shield victims of rape or sexual abuse from the humiliation of having their personal conduct, unrelated to the pending charges, paraded before the jury and the public when such conduct is irrelevant to the defendant's guilt. *McCoy v. State*, 2010 Ark. 373, 370 S.W.3d 241. The circuit court is vested with a great deal of discretion in determining whether the evidence is relevant, and we will not overturn the circuit court's decision unless it constitutes clear error or a manifest abuse of discretion. *Woodall v. State*, 2011 Ark. 22, 376 S.W.3d 408.

In making this argument, Holland relies on our decision in *Marion v. State*, 267 Ark.

11

SLIP OPINION

345, 590 S.W.2d 288 (1979). There, Marion's defense to the rape charge was that no sexual intercourse occurred between him and the victim on the alleged occasion. He proffered evidence that the charge against him was made by the victim because of a fight they had as a result of his contracting a venereal disease from her. At the time of the fight, the victim threatened that "she would get even with him," and Marion alleged that the charges were filed as a result of that threat. Under those circumstances, we held that the victim's bias, prejudice, or ulterior motive for filing the charge was relevant to the question whether the alleged act of sexual intercourse actually occurred and that the probative value of the evidence outweighed its inflammatory or prejudicial nature.

We have since emphasized that evidence of an alleged victim's motive or bias is admissible only when it is relevant and its probative value outweighs its prejudicial nature. *Jackson v. State*, 368 Ark. 610, 249 S.W.3d 127 (2007). Having examined the proof offered in this case, we cannot say that the circuit court abused its discretion by excluding the evidence, as the probative value of the evidence was slight, and even remote, compared to the prejudicial nature of the evidence. We find no error.

*Psychotherapist/Patient Privilege*

As his last point on appeal, Holland argues that the circuit court's ruling denying him access to JD's records of treatment violated his constitutional rights of confrontation and due process. He contends that the psychotherapist/patient privilege granted by our court rules is overcome by these constitutional guarantees. Further, he asserts that any error in the circuit court's ruling is not harmless.

This issue arose in the following manner. At a pretrial hearing on the Rule 404(b) and rape-shield evidence, JD testified on cross-examination by Holland's counsel that he had been transported by the police and admitted to Rivendell following an argument with his mother. When asked whom he first told about the abuse, JD responded that his initial disclosure was made to an admissions nurse during the intake process at Rivendell. Holland subsequently filed a motion seeking the production of JD's mental-health records. At a hearing, Holland asserted that he was entitled to the records because JD had testified that he had revealed the abuse during the intake process, whereas he had said in previous statements to the police that he had first disclosed the information to a therapist. Holland argued that the records might contain information to impeach JD's testimony on the timing of the disclosure. In response, the State argued that the materials were privileged.

Based on Holland's motion, the circuit court had conducted an in-camera review of JD's records from Rivendell and reported to the parties that the records contained no exculpatory information. Holland then asked the court whether it had reviewed the records to note each time JD had responded to a question concerning whether he had a history of sexual abuse. The court said that it had not reviewed the records with an eye for that information, but it agreed to do so. Later that day, the court reconvened the hearing and advised the parties that the integrated risk forms from JD's admissions in August, October, and November 2011 stated that the "patient has never been abused." Holland inquired whether the records contained anything to indicate JD's tendency to be untruthful. The circuit court stated that the records contained no such information. Holland then asked for the production

of the records on the ground that they contained exculpatory material. Holland explained that his defense was that JD had a motive to fabricate the allegation in order to extricate himself from being in trouble. The court took the issue under advisement. At a subsequent hearing six months later, Holland renewed his motion for the production of JD's records from Rivendell. The circuit court denied that request.

Holland asserts that the circuit court erred in its ruling. The State responds that Holland's argument is foreclosed by our decision in *Johnson v. State*, 342 Ark. 186, 27 S.W.3d 405 (2000) (*Johnson II*). Holland maintains that the decision in *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), compels a different result.

We begin with the psychotherapist/patient privilege that is set forth in Rule 503(b) of the Arkansas Rules of Evidence:

> *General Rule of Privilege.* A patient has a privilege to refuse to disclose and to prevent any other person from disclosing his medical records or confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

This privilege applies in both criminal and civil cases, and is inapplicable only when proceedings are initiated to hospitalize a patient for mental illness, when a mental examination is ordered by the court, or when a patient relies on his or her physical, mental, or emotional condition as an element of his or her claim or defense. Ark. R. Evid. 503(d); *Johnson II*, *supra*.

The psychotherapist/patient privilege was at issue in *Johnson II*, *supra*. In that case, a six-year-old child had witnessed her mother's murder, and she received therapy to deal with

that traumatic event. At Johnson's first trial, she waived the psychotherapist/patient privilege to allow access to her treatment records, and the circuit court considered her incompetent to testify. Johnson was convicted and sentenced to death, and this court reversed. *Johnson v. State*, 326 Ark. 430, 934 S.W.2d 179 (1996) (*Johnson I*). At the time of retrial, the circuit court found that the child was competent as a witness, and she testified at the second trial. Before that trial, the child had seen a different therapist, and she asserted the psychotherapist/patient privilege to preclude the disclosure of her records associated with her new therapist. Johnson argued that he was entitled to the records pursuant to his right to present a defense, contending that the denial of access deprived him of the ability to test her veracity both in cross-examination and in the presentation of impeachment evidence. He claimed that his constitutional right to present a defense superseded the psychotherapist/patient privilege. The circuit court disagreed, and Johnson was again convicted and sentenced to death. This court upheld the circuit court's ruling in *Johnson II*, holding that the privilege preempted the need to discover admissible evidence. In so holding, we relied on the Supreme Court's decision in *Jaffee v. Redmond*, 518 U.S. 1 (1996), where the Court recognized the psychotherapist/patient privilege for the first time. In *Johnson II*, we also held that the records were not discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963), because the records were not in the hands of the State and because there was no showing that the State had access to or knowledge of the records and their contents.[2]

---

[2]We note that Johnson sought habeas-corpus relief in federal court claiming error in our decision in *Johnson II* with regard to the privilege issue. However, the Eighth Circuit upheld the denial of his petition on the ground that our decision was not an unreasonable

In *Ritchie*, *supra*, the question presented was whether and to what extent a State's interest in the confidentiality of its investigative files concerning child abuse must yield to a criminal defendant's Sixth and Fourteenth Amendment right to discover favorable evidence. There, the Commonwealth of Pennsylvania had established a special protective service agency (CYS) to investigate cases of suspected child maltreatment and neglect. Ritchie was charged with sex-based offenses regarding his thirteen-year-old daughter. The child reported the incidents to the police, who referred the matter to CYS. During pretrial discovery, Ritchie served CYS with a subpoena, seeking access to the records concerning his daughter. CYS refused to comply with the subpoena, claiming that the records were privileged as set forth by statute, which provided that all reports and other information obtained in the course of a CYS investigation must be kept confidential. In response, Ritchie argued that he was entitled to the information because the file might contain exculpatory material. The trial court quashed the subpoena for the records. The Pennsylvania Supreme Court determined that the trial court's order violated both the Confrontation and the Compulsory Process Clauses of the Sixth Amendment and concluded that Ritchie, through his lawyer, was entitled to review the entire file to search for any useful evidence.

A divided Supreme Court affirmed in part and reversed in part and remanded. With respect to the Confrontation Clause issue, a plurality of four justices concluded that the clause was not implicated. The plurality rejected the notion that the Confrontation Clause involved a constitutionally compelled rule of pretrial discovery. Instead, the plurality took the position

application of federal law. *Johnson v. Norris*, 537 F.3d 840 (8th Cir. 2008).

that "the right to confrontation is a *trial* right, designed to prevent improper restriction on the types of questions that defense counsel may ask during cross-examination." *Ritchie*, 480 U.S. at 52 (emphasis in original). To that point, the plurality opinion recited that "[t]he ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Id.* at 53. The plurality went on to say that "the Confrontation Clause only guarantees 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Id.* (emphasis in original) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)).

The Supreme Court reached a majority decision with respect to the Compulsory Process Clause. The majority adopted for the purposes of that case a due-process analysis to decide the issue. Under that analysis, and citing *Brady v. Maryland*, *supra*, the Court noted that the government has an obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. The Court observed that the CYS files in question were subject to a qualified privilege, as the statute provided that information shall be disclosed in certain circumstances, including when disclosure was directed by court order. Because the statute contemplated some use of CYS records in judicial proceedings, the Court reasoned that the statute did not prevent all disclosure in criminal trials. Therefore, the Court held that, under the circumstances, the privilege must yield to the right of due process and that Ritchie was entitled to know whether the CYS files contained exculpatory information.

However, the Court also held that a defendant's right to discover exculpatory evidence

does not include the unsupervised authority to search through the files. Instead, the Court determined that protecting Ritchie's rights, as well as the State's interest of safeguarding child-abuse information, would best be served by having the trial court conduct an in camera review of the files. The Court relied on precedent setting forth the standard definition of materiality and observed that evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Therefore, on remand the trial court was to examine the files to determine whether they contained information that would have changed the outcome of trial. If they did, then Ritchie was entitled to a new trial. However, if the trial court determined that the files did not contain such information, or if the nondisclosure was harmless beyond a reasonable doubt, then, according to the Court, the lower court would be free to reinstate the conviction.

When we consider the circumstances of the present case and the decisions in both *Johnson II* and *Ritchie*, we cannot say that the circuit court's ruling was in error. Perhaps inspired by *Ritchie*, the circuit court twice conducted an in camera review of JD's records from Rivendell. The circuit court advised that the records included intake forms that stood in contradiction of JD's pretrial testimony as to the timing of his disclosure of the abuse, but the court otherwise announced that the records contained no other exculpatory material. Our review of the trial record reveals that Holland presented his defense that JD was motivated to falsely accuse Holland in order to get out of trouble. Given the scant evidentiary value of the intake forms toward that defense, particularly when our review of the trial reveals that Holland confronted JD on cross-examination with two prior inconsistent statements on that

18

very point, there is no basis on which to proclaim reversible error. We simply cannot conclude that Holland's defense was compromised in any way by the circuit court's ruling. Consequently, we affirm the circuit court's decision.

Before concluding this opinion, we take note of Holland's contention that JD waived the privilege by testifying about his admittance to Rivendell and the reasons behind his admission. Although Holland briefly raised this point below, he failed to develop the argument or to obtain a specific ruling on this issue. As such, the argument is not preserved for appeal. *Gooch*, *supra*.

Affirmed.

HART and WYNNE, JJ., dissent.

**JOSEPHINE LINKER HART, Justice, dissenting.** The circuit court found that the integrated risk-assessment forms from JD's admission to Rivendell in August 2011 and October 2011, and a third assessment in November 2011 that was a copy of the October form, indicated that JD had never been sexually abused. At trial, JD took the stand, and during cross-examination, the circuit court prevented Holland's attorney from asking JD about these prior inconsistent statements. While admitting denials to his mother, JD never admitted that he had made prior inconsistent statements to Rivendell staff or anyone else about whether he had been sexually abused, and these prior inconsistent statements were never made known to the jury.

These statements were not made on a collateral matter but, instead, were prior inconsistent statements that directly impeached JD's credibility with respect to his subsequent

claims of sexual abuse and challenged the veracity of his testimony about these claims. Presumably, JD's credibility was a major consideration for the jury because its decision to convict Holland for second-degree sexual assault turned on the weight of JD's testimony. Further, these statements were made to determine JD's treatment and were not mere denials to evade his mother. In fact, our hearsay rule does not exclude as hearsay "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Ark. R. Evid. 803(4). This court has recognized that the basis for this hearsay exception is the patient's strong motivation to be truthful in giving statements for diagnosis and treatment. *Hawkins v. State*, 348 Ark. 384, 387–88, 72 S.W.3d 493, 494 (2002). These statements not only had impeachment value but also would have been admissible for the truth of the matter asserted because they were highly reliable. *See id.* (holding that an examining physician's testimony that the victim had identified defendant as the person who raped her was admissible in rape prosecution under hearsay exception for statements made for purposes of medical diagnosis or treatment).

I acknowledge that we will not reverse a decision to exclude evidence absent the circuit court's abuse of discretion or absent a showing of prejudice. *Scamardo v. State*, 2013 Ark. 163, at 7, 426 S.W.3d 900, 904. A witness's credibility, however, is always a relevant issue subject to attack. *Fowler v. State*, 339 Ark. 207, 219, 5 S.W.3d 10, 16–17 (1999). The right of free and unfettered cross-examination of the accuser by the accused is basic to our

system of justice. *Miller v. State*, 269 Ark. 409, 414, 601 S.W.2d 845, 848 (1980).

The majority concludes that, given the "scant evidentiary value" of the statements and the existence of two prior inconsistent statements—which the majority does not identify in its opinion—Holland's defense was not compromised. I, however, cannot say that Holland was not prejudiced by circuit court's decision to exclude highly reliable, prior inconsistent statements that called into question JD's credibility.

Accordingly, I respectfully dissent.

**ROBIN F. WYNNE, Justice, dissenting.** I find merit in appellant's third point on appeal and would reverse and remand. After an in-camera review of JD's records from Rivendell, the circuit court disclosed to counsel that JD's admission documents showed the following: the August 9, 2011 form was marked "patient has never been abused"; the October 29, 2011 form was marked "patient has never been abused"; and the records from his November 3, 2011 admission to long-term treatment contained a photocopy of the October admission form. In the therapist's notes dated November 17, JD initiated the topic of sexual abuse. Defense counsel explained that this evidence directly contradicted prior testimony by JD regarding when he first disclosed the abuse and was a crucial part of the defense theory that JD fabricated the allegations because he was in trouble (and thus was being admitted to Rivendell for long-term treatment). The circuit court denied appellant's request for production of this exculpatory evidence. In my view, this was error.

While the majority concludes that no reversible error occurred, I cannot agree. JD never admitted at trial that he made prior inconsistent statements to Rivendell staff, and his

credibility was the central issue in this case, as his testimony was the only evidence that the sexual abuse took place. The psychotheraptist–patient privilege of Arkansas Rule of Evidence 503 must yield to a criminal defendant's constitutional rights. I would follow the majority of other jurisdictions that have extended the protections outlined in *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) (plurality opinion) to an otherwise absolute psychotherapist–patient privilege. *Commonwealth v. Barroso*, 122 S.W.3d 554 (Ky. 2003) (collecting cases).

Therefore, I respectfully dissent.

*Lassiter & Cassinelli*, by: *Erin Cassinelli*; and
*Jeff Rosenzweig*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Rebecca Kane*, Ass't Att'y Gen., for appellee.